UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Leda Dunn Wettre |
| v. | Mag. No. 19-8028 |
| NARSAN LINGALA and SANDYA REDDY | **CRIMINAL COMPLAINT** |

I, Michael A. Scimeca, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Michael A. Scimeca, Special Agent
Federal Bureau of Investigation

February 1, 2019      at      Essex County, New Jersey
Date                          County and State

Honorable Leda Dunn Wettre
United States Magistrate Judge
Name and Title of Judicial Officer      Signature of Judicial Officer

## ATTACHMENT A

### (Murder-for-Hire)

In or around May 2018 through in or around August 2018, in the District of New Jersey, and elsewhere, defendants

> NARSAN LINGALA
> and SANDYA REDDY

did knowingly and intentionally conspire to and travel in interstate commerce, that is, from Indiana to New Jersey, and did conspire to and use, and cause another to use, an interstate facility, that is, a telephone, with intent that a murder be committed, in violation of the laws of the State of New Jersey, that is, New Jersey Statutes Annotated, Section 2C: 11-3, as consideration for a promise and agreement to pay something of pecuniary value, that is, United States currency.

In violation of Title 18, United States Code, Sections 1958 and 2.

## ATTACHMENT B

I, Michael A. Scimeca, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with witnesses and other law enforcement officers, and my review of reports, documents, and evidence. Where I provide others' statements, I provide them in substance and in part. Because I submit this complaint for a limited purpose, I have not set forth every fact that I know about this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about that date.

### Lingala Asks Inmate for Hitman

1. In or around May 2018, defendant Narsan Lingala ("LINGALA") was in a holding cell at the Middlesex County Superior Court House as he awaited a court hearing. While in the holding cell, LINGALA asked another inmate if he knew anyone who could kill his estranged wife ("Victim"). The other inmate ("Confidential Source") responded that he knew such a person.

2. On or about June 13, 2018, LINGALA and Confidential Source spoke by phone. At the time, LINGALA was in Indiana and Confidential Source was in New Jersey. LINGALA stated, "We need to meet." Confidential Source told LINGALA that he would introduce him to his friend "Manny." On or about June 18, 2018, LINGALA and Confidential Source spoke again by phone. LINGALA stated, "Everything is still on."

### Lingala Speaks with Purported Hitman

3. On or about June 20, 2018, LINGALA spoke by phone with "Manny," who was actually an undercover law enforcement agent ("Undercover Agent"). LINGALA said he would be away for a few weeks, but stated, "We need to meet."

4. On or about July 1, 2018, Undercover Agent sent a text message to LINGALA asking him when he wanted to meet. LINGALA replied, "I am still in Indiana and will let you know, when I am in Jersey." Undercover Agent asked, "Do you still need my services?" LINGALA replied, "Yes I do," but said he was not in a rush.

5. On or about July 18, 2018, LINGALA spoke with Undercover Agent by phone. At the time, LINGALA was in Indiana and Undercover Agent was in New Jersey. LINGALA stated that when he traveled to New Jersey in a couple of weeks, the two would "meet and talk."

6. On or about July 27, 2018, LINGALA and Undercover Agent spoke by phone. During that recorded call, Undercover Agent asked LINGALA if he was "serious about this." LINGALA said the timing was not right because he was in

Indiana, but stated, "I am serious about this," and, "I definitely want this to happen." The two agreed that LINGALA would contact Undercover Agent the next time he was coming to New Jersey. During the same call, LINGALA and Undercover Agent began to discuss the price for murdering Victim.

7. On or about August 13, 2018, LINGALA and Undercover Agent spoke by phone. During that recorded call, LINGALA stated that he was still in Indiana but asked whether Undercover Agent would be available to meet the following weekend. Undercover Agent responded affirmatively. Additionally, LINGALA asked, "Is it also possible to pay you after it is done, or do I have to pay you . . . up front?" Undercover Agent did not provide a clear answer at that time.

8. On or about August 16, 2018, LINGALA and Undercover Agent spoke by phone. During that recorded call, Undercover Agent and LINGALA agreed to meet on Saturday, August 18, 2018, because LINGALA had to drive ten hours to get to New Jersey. During the call, Undercover Agent and LINGALA again discussed the issue of price. Undercover Agent said that LINGALA may be able to give him jewelry as a deposit and then pay him after the job was completed. LINGALA said, "I want to pay you."

9. On or about August 18, 2018, LINGALA and Undercover Agent spoke by phone. At the time, LINGALA was in Pennsylvania and Undercover Agent was in New Jersey. During that recorded call, the two agreed to meet that afternoon at a shopping mall in New Jersey. At approximately 2:26PM, LINGALA sent Undercover Agent a text message stating, "On my way." At approximately 2:38PM, LINGALA called Undercover Agent and asked, "Are you at the mall?" Undercover Agent said that he was, and he proposed that they meet outside, in front of a specific store at the mall (the "Store"). LINGALA told Undercover Agent, "You'll see a black van."

### Lingala and Reddy Meet Purported Hitman

10. On or about August 18, 2018, LINGALA and his girlfriend, defendant Sandya Reddy ("REDDY") arrived by car to the parking lot outside the Store. LINGALA and REDDY approached Undercover Agent. LINGALA introduced REDDY as his girlfriend and stated that there were "no secrets between us."

11. LINGALA, REDDY, and Undercover Agent entered Undercover Agent's car. They proceeded to have a conversation that was video recorded.

12. Undercover Agent asked LINGALA if REDDY knew what was happening. LINGALA responded, "Everything. Everything." LINGALA stated that REDDY had "even been pitching ideas."

13. Undercover Agent asked LINGALA to confirm what he wanted Undercover Agent to do. LINGALA said, "I want that woman to be out of my life

... Totally. Never again. She never comes back." During the conversation, Undercover Agent said, "Look, I'm going to be frank with you . . . You want me to take care of her?" LINGALA responded, "Yeah." Undercover Agent then stated, "She's done, I'm going to kill her. End of story." LINGALA responded, "Yeah. End of story." Undercover Agent added that he would not torture Victim. REDDY stated, "Right," and LINGALA added, "We don't want that."

14. During the conversation, LINGALA gave Undercover Agent information about Victim. LINGALA provided Victim's full name, home address, age, and home phone number. LINGALA also described the entrances to and layout of Victim's home; the name of the company where she worked; the timing and details of her work commute; and the name of her boyfriend and the city where he lived. Additionally, LINGALA showed Undercover Agent photographs of the exterior and interior of Victim's home. After describing the interior of Victim's home, LINGALA asked, "Does that make it pretty easy for you?" Undercover Agent responded affirmatively. LINGALA asked Undercover Agent, "What more information can I give you?"

15. REDDY also gave Undercover Agent information about Victim. REDDY used her cell phone to access online pictures of Victim and showed Undercover Agent two pictures of Victim from Facebook. REDDY let Undercover Agent take a photograph of the pictures displayed on her phone. REDDY also used her phone to search the Internet for the address where Victim works, and she let Undercover Agent take a picture of that information. REDDY also gave paper and a pen to LINGALA and Undercover Agent. When discussing if Victim would be home alone, REDDY stated, "Her boyfriend might be there."

16. Undercover Agent, LINGALA, and REDDY also discussed the price that Undercover Agent would be paid. Undercover Agent said the job would cost between five to ten thousand dollars, depending on the job's complexity. LINGALA stated, "Okay." Undercover Agent later clarified, "What are we agreeing [to] here on price?" LINGALA replied, "Five to ten thousand."

17. LINGALA asked if he could pay after the job was done. Undercover Agent said he would need some form of down payment. LINGALA and REDDY discussed the issue, and then LINGALA and Undercover Agent agreed upon a thousand-dollar down payment. Specifically, LINGALA asked Undercover Agent, "Can I give you a thousand down payment?" Undercover Agent agreed. LINGALA later stated, "I want that money to go into your pocket." LINGALA informed Undercover Agent that making the down payment would take about two weeks.

18. Undercover Agent asked LINGALA and REDDY how they wanted to make the down payment. LINGALA replied in part, "Cash." REDDY said, "Cash, but I can mail it. If you give me an address, I can mail it in an envelope, like Priority Mail, or Express." Undercover Agent said he preferred not to use mail. REDDY proposed using Venmo or a "money gram." Undercover Agent declined.

LINGALA asked Undercover Agent if he knew anyone in Indiana to whom they could give the money. Undercover Agent said he may know such a person.

19. After the meeting ended, authorities arrested LINGALA and REDDY.

### Post-Arrest

20. In a post-arrest, post-*Miranda* statement, REDDY made various admissions. For example, REDDY stated that LINGALA had previously told her that he met someone in jail who introduced him to a person who could "take care of" Victim. REDDY said that at the time, she did not understand that this meant killing Victim, but she admitted that during the August 18, 2018 meeting, she understood Undercover Agent was being hired to kill Victim. REDDY also admitted that an agreement had been reached with "Manny" (i.e. Undercover Agent), even though there was not a final resolution on how to exchange money.

21. REDDY said LINGALA hoped to get rid of Victim to avoid paying child support, and so that his kids would be returned to him. REDDY admitted that she owned a fictitious company that helped LINGALA avoid paying child support. REDDY described LINGALA's relationship with Victim as one of "hatred."

22. Since his arrest, LINGALA has tried to persuade REDDY to not plead guilty. For example, in or around October 2018, LINGALA sent REDDY a letter. Among other statements, LINGALA wrote, in sum and substance and in part:

a. "Do not take a plea . . . . The statement you gave is going to hurt you and if you testify against me, it will hurt you badly. You are the money man who is paying for everything and if this comes out, you will be in bad shape. Do you understand?"

b. "You are in danger if you take the plea. I will also be forced to use the statements you made, which will put you . . . in the worst situation."

c. "By doing this, you will be the loser. Are you even understanding what I am saying???"

d. "If you take plea, our relationship will be over."

e. "Listen to your statement in the discovery and you should know what a mistake you made by giving such statement. You will not survive a trial against me. Do you understand???? The only option is to fight the case together against the prosecution."